THE STATE COMPTROLLER *vs.* JOHN HOOKER.

Hartford Dist., May T., 1890. ANDREWS, C. J., CARPENTER, LOOMIS, SEYMOUR and TORRANCE, Js.

An act passed in 1871 making an addition to the salary of the reporter of judicial decisions, contained the following provision:—" It shall be the duty of the reporter to cause to be stereotyped, at his own expense, all volumes hereafter published by him; the plates to be the property of the state, subject to the right of the reporter to use the same for printing copies therefrom." Held—

1. That the right of the reporter to print copies from the plates was an exclusive right, and that the state had no right to use the plates for the purpose.

2. That this right was not determined by his resignation or death, but was property in his hands subject to his disposal.

[Heard May 15th—decided July 10th, 1890.]

AMICABLE SUBMISSION upon an agreed statement of facts, in the Superior Court in Hartford County; reserved for advice. The case is fully stated in the opinion.

CARPENTER, J. This is an amicable submission to the Superior Court, under the statute authorizing it, of a question arising upon an agreed statement of facts. These facts are substantially as follows :—

The defendant was, in the year 1871, and for several years before had been, and continues now to be, the reporter of judicial decisions of the state, and up to the time of the passage of the act to be cited had been the sole and absolute owner of all the volumes of the Connecticut Law Reports

published by him, including the copyright of the same. The General Assembly, in the year 1871, passed an act increasing the reporter's salary, which contained the following provision :—" It shall be the duty of the reporter to cause to be stereotyped, at his own expense, all volumes of the Connecticut Law Reports hereafter published by him ; the plates to be the property of the state, subject to the right of the reporter to use the same for printing copies therefrom." (Acts of 1871, p. 532, sec. 2). This statute was in force until 1883, when an act was passed providing for the printing of the subsequent volumes by the state, or on its account, under the direction of the comptroller of the state. Mr. Hooker had published, before this time, and after the act of 1871 took effect, twelve volumes, namely, volumes 37 to 48 inclusive, all of which were stereotyped, and he afterwards procured the stereotyping of volume 36, making thirteen volumes in the whole that were stereotyped by him, all of which volumes he now owns. The interest of the reporter in the profits to be gained from the sale of the volumes thus stereotyped was an important part of his compensation for his services as reporter. The copyrights of these volumes were taken out by Mr. Hooker in his own name and for his own benefit and are now owned by him. The plates are now in the possession of the state, being kept in the basement of the capitol, whence they are taken from time to time by Mr. Hooker, for the purpose of printing sheets therefrom, and returned when they have been used.

The questions submitted by the parties to the court are— (1) Whether, as the state owns the stereotype plates of said twelve volumes, and the reporter has the right only to use them for printing therefrom, this right of the reporter is an exclusive one, or whether the state can at its pleasure print copies from the plates and put them into the market on its own account ; and (2) Whether, if the reporter has this exclusive right, it is one that will be affected by his resignation or death, or is property in his hands, with all the incidents of ordinary property. The case is reserved for the advice of this court.

As the profits to be made from the volumes published were to be an important part of the compensation of the reporter, it is clear that the entire profits should go to him, else they could not be relied on as of any certain benefit to him. If the state had the right to use the plates for printing copies for its own benefit, then it might appropriate the whole profits, for there would be nothing to prevent it from using the plates as soon as made, and, as they had cost the state nothing, it could put an edition on the market at a much lower price than the reporter could afford to do. It is plain that the power to do this was never intended by the legislature to be retained for the state. Indeed the express provision that the state should own the plates " subject to the reporter's use," thus separating the bare title from the beneficial use, would seem of itself to limit the state to what was expressed, namely, a bare ownership, while the term, " subject to the reporter's use," would seem equally to subordinate this bare ownership to the beneficial use. The object of the provision was undoubtedly to ensure the safe custody and preservation of the plates, as otherwise they would have been at the disposal of the different reporters, and might be lost or destroyed. The first question therefore we answer by saying that the reporter has the exclusive right to use the plates for printing.

And we think it equally clear that the right of the reporter to the exclusive use of the plates for printing is property in his hands, with all the incidents of ordinary property, not affected by his resignation or death, and subject to his disposal.

The only possible question that can arise here grows out of the use of the term " reporter " in the statute—" subject to the right of *the reporter* to use the same." But as the statute was intended as a permanent one, or at least as one that might survive several reporters, the use of that term became necessary. It is difficult to frame any circumlocution that would supply its place—at least any that would not be awkward and unnatural.

Under the former law the reporter had been absolute

owner of his volumes. Suppose the statute creating the office and fixing the salary, had said in terms, " the volumes published to be the property of the reporter." In that case it could not be claimed for a moment that they would belong to him only while he held the office. Yet that is really the same question with the present one.

If the reporter ceases to have an interest in the use of the plates on going out of office, either by voluntary resignation or dismissal, or by death, it is obvious that great injustice may be done him. If he should die after the type had been set and the plates cast, and before he had printed a sheet, the whole would go out of his hands, and that under a system in which he was to have the profits from the books as " a part of his compensation." He would lose all the money expended and all his labor in preparing the volume. And the wrong would be the same, though less in degree, if at any time afterwards, while the sale of the volumes yielded a profit, he should be cut off from receiving it.

Of course, if the reporter's interest ceases with his ceasing to occupy the office, the benefit which he loses goes to his successor, for by the terms of the statute the right to print from the plates is a right of " the reporter," and if not of the reporter who got out the volume then necessarily of the reporter who succeeds him. But this seems absurd. The successor has done nothing to merit it. Why should he have the benefit of the labor and outlay of his predecessor? It would be an unjust gain to him, just as it would be an unjust loss to the other. A right intended as compensation to the former reporter, goes to the new reporter who has done nothing to earn it. We cannot consider this as the intention of the statute. We therefore answer the second question by saying that the right to print from the plates belongs to the defendant, and will not be affected by his death or resignation.

We advise the Superior Court to render judgment for the defendant.

In this opinion the other judges concurred.